## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JASON HARRIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | Civil Action Number |
| | ) | **2:17-cv-01557-AKK** |
| **THE RAYMOND CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### <u>MEMORANDUM OPINION</u>

This products liability action arises from injuries Jason Harris sustained in an accident while operating an electric pallet jack manufactured by The Raymond Corporation ("Raymond"). Doc. 1-1. Harris contends that defects in the pallet jack caused the accident, and he asserts a claim against Raymond under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"). Before the court are Raymond's motion for summary judgment, doc. 30, and motion to exclude the testimony of Harris's expert, Charles E. Benedict, Ph.D., doc. 32. The motions are fully briefed and ripe for review. *See* docs. 30, 32, 47, 48, 51, and 52. After careful consideration of the briefs and the relevant law, the court finds that the motion to exclude is due to be granted in part, and the motion for summary judgment is due to be denied.

# I.    STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of proving the absence of a genuine dispute of material fact. *Id.* at 323.  The burden then shifts to the non-moving party, who is required to go "beyond the pleadings" to establish that there is a "genuine issue for trial."  *Id.* at 324 (internal citations and quotation marks omitted).  A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-movant.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion."  *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (citing *Bald Mountain Park, Ltd. v.*

*Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)).  Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that a jury could reasonably find for that party."  *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II.  RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A.  <u>The product at issue</u>

Harris sustained serious injuries in an accident while he was working as an order picker at a Dollar General distribution center in Bessemer, Alabama.  Docs. 38-3 at 9; 38-5 at 2.  The accident involved a model 8400 electric pallet jack manufactured by Raymond.  Docs. 38-1 at 16; 38-6 at 23; 39 at 20-21.  Pallet jacks are used in warehouses to move inventory.  Docs. 38-6 at 22.  An operator may stand and ride on the 8400 pallet jack when operating it, or walk beside the pallet jack when picking up inventory.  *See* doc. 34 at 25.

The 8400 pallet jack has both mechanical and electrical components, and its handle is equipped with controls to operate the pallet jack, including throttle twist grips, which allow an operator to move the pallet jack forwards or backwards by twisting the throttle.  *See* docs. 34 at 27, 32, 44; 37 at 2; 38-1 at 10; 38-4 at 10.  The farther the operator twists the throttle, the faster the pallet jack travels.  Doc. 34 at 44.  Relevant to this case, the throttle assembly inside the pallet jack's handle includes a "roll pin," also referred to as a "slotted spring pin," that fits through

small holes to hold the assembly together, and a "torsion spring" that restores the throttle to a neutral position after the operator takes her hand off the throttle twist grip. Docs. 37 at 3-9; 37-1 at 10; 38-1 at 13, 19-22, 24; 38-4 at 37, 38-6 at 35; 39 at 17; 47-18 at 2-3. When the throttle returns to neutral, the pallet jack will "plug," or coast, to a stop. Doc. 38-1 at 13. If the torsion spring fails to return the throttle to a neutral position, the pallet jack can continue to move even after the operator takes her hand off the twist grip. Docs. 38-1 at 14, 18, 53, 63; 38-6 at 34. To stop the pallet jack, an operator can twist the throttle grip in the opposite direction the pallet jack is moving, which is called "plugging" and is the normal way of braking. Docs. 34 at 46, 48; 38-1 at 9-10, 17. Alternatively, an operator can stop the pallet jack by pushing the handle down to a horizontal position, moving it up to a vertical position, or use the emergency stop and reverse button. Docs. 34 at 31, 44, 48-49; 38-2 at 9; 37 at 2; 38-4 at 10; 38-6 at 24.

The 8400 pallet jack is also equipped with a trademark feature Raymond named CoastPRO that is designed to make it easier for an operator to use the pallet jack to pick up merchandise. Docs. 34 at 55; 38-2 at 3-4. CoastPRO limits the pallet jack to walking speed, and it allows the operator to walk beside the pallet jack to pick up merchandise while moving the jack by pushing "jog trigger" buttons on the ends of the handle or by twisting the throttle. Docs. 34 at 33, 55-56; 38-1 at 9; 38-4 at 16; 37 at 2; 38-6 at 28. Although the mechanical brakes are

disengaged when the pallet jack is in CoastPRO mode, the operator can still stop the pallet jack by pushing the handle up or down, hitting the emergency stop, or "plugging" the throttle. Docs. 38-1 at 9; 38-2 at 9-10; 38-6 at 24; 34 at 55, 57.

To engage CoastPRO, the operator must bring the pallet jack handle down to a forty-five degree angle, and then either press one of the two CoastPRO buttons, or push one of the jog trigger buttons.[1] Docs. 34 at 27, 56; 38-1 at 11; 38-6 at 27. The pallet jack beeps twice when CoastPRO mode is engaged initially. Doc. 34 at 56. Although the product's manual and Dollar General's rules warn operators to bring the pallet jack to a complete stop before engaging CoastPRO, operators are able to engage CoastPRO while the pallet jack is moving. Docs. 38-1 at 10-11; 34 at 56; 38-6 at 25-27.

The Bessemer warehouse performs regular preventative maintenance on its 100 pallet jacks according to Raymond's specifications. *See* doc. 47-12 at 25-26. This includes taking the pallet jacks' handles apart to inspect the components, including the throttle assembly. Docs. 38-6 at 5, 11; 47-12 at 4-5, 25-26. Dollar General also repairs the pallet jacks as needed, and obtains replacement parts from an authorized Raymond dealer. *See* docs. 38-6 at 31, 38-39, 46; 47-12 at 26. Pertinent here, maintenance records reveal that Dollar General's employees

---

[1] If the throttle is not in the neutral position when an operator pushes a jog trigger button, then the pallet jack gives an error code and brings itself to a stop instead of engaging CoastPRO. *See* docs. 38-1 at 12; 38-4 at 19.

replaced a broken handle and seat spring on the subject pallet jack three months before the accident, then reattached a roll pin in the handle two days later. Docs. 35 at 1; 38-6 at 31.

B.    The accident

When Harris began his shift on the day of the accident, he performed the required daily check to ensure the pallet jack was operating correctly. Doc. 38-3 at 6, 15-16. *See also* doc. 38-4 at 17. Harris did not encounter any issues with the pallet jack during his daily check or before the accident. Doc. 38-3 at 18. While working that day, just before the accident, Harris stopped the pallet jack, stepped off it, brought the handle to a forty-five degree angle, and engaged CoastPRO. Docs. 38-2 at 6, 14; 38-3 at 27. The unit beeped twice to confirm the CoastPRO mode. Doc. 38-3 at 27. Harris stood to the side of the pallet jack, and then walked to the front of it to pick up merchandise. Doc. 38-2 at 7. However, when Harris turned back towards the pallet jack, he saw it coming towards him. Doc. 38-3 at 27. The accident pinned his left ankle against a rack, resulting in lacerations and a severely broken ankle, which required six surgeries to reconstruct. *Id.* at 9-10.

Dewayne Bowden, who witnessed the accident, testified that he saw Harris get off the pallet jack and activate CoastPRO. Doc. 38-2 at 6. While Harris was picking up merchandise, Bowden saw the pallet jack move forward, "[a]nd instead of it going straight, it turned and pinned [Harris] against the pallet and the rail."

6

Doc. 38-2 at 5.  Bowden stated that the pallet jack turned on its own without any triggering action by Harris.  Doc. 38-2 at 5-6, 16.

Immediately after the accident, Ron Musser, a maintenance mechanic at the warehouse, conducted a full inspection and tests on the pallet jack.  Doc. 38-6 at 18-19, 24-29.  Musser first tested how far the pallet jack could travel before coasting to a stop in CoastPRO mode by "running [the pallet jack] full speed, hitting the CoastPRO, and jumping off it."  *Id.* at 24-26.[2]  Musser determined that the subject pallet jack could travel approximately thirty-six feet before coasting to a stop in CoastPRO mode.  *Id.* at 25.  In addition, "[a]fter extensive testing [with the pallet jack], . . . the throttle stuck just enough for it to creep," meaning that it continued to move after it should have coasted to a stop.  *Id.* at 27.  Musser could only get the throttle to stick and cause the unit to creep forward if the pallet jack was moving when he engaged CoastPRO.  Doc. 38-6 at 43.

After conducting his tests, Musser disassembled the pallet jack's handle to fix the sticking throttle, and he found that the "roll pin had moved out [from its holes] just a little bit, catching the plastic housing" of the throttle.  Doc. 38-6 at 28.  Musser replaced the roll pin as a result.  *Id.* at 35.  In addition, Musser has conducted other testing to determine why the pallet jacks' throttle may stick, and he found that "[s]ometimes the [torsion] spring gets weak" after a lot of use and

_____

[2] Musser guessed that Harris operated the pallet jack at full throttle when he jumped off it prior to the accident based on how other operators used the pallet jacks.  Doc. 38-6 at 25-26, 43.

would not return the throttle to the neutral position.  *See* doc. 38-6 at 30, 33-34.

Consequently, Musser asked another employee to "order a bunch of springs."  *Id.*

at 33.

## III.  ANALYSIS

Harris asserts a claim against Raymond based on his contention that the

alleged defects in the design of the pallet jack caused the accident.  Docs. 1; 47 at

30.  "'Under the AEMLD, a manufacturer has the duty to design and manufacture

a product that is reasonably safe for its intended purposes and uses.  However, the

manufacturer of a product is not an insurer against all harm that might be caused

by the use of the product, and [. . .] [p]roof of an accident and injury alone is

insufficient to establish fault under the AEMLD.'"  *Verchot v. Gen. Motors Corp.*,

812 So. 2d 296, 301-03 (Ala. 2001) (quoting *Brooks v. Colonial Chevrolet-Buick,*

*Inc.*, 579 So. 2d 1328, 1331-32 (Ala. 1991)).  To succeed on an AEMLD claim, a

plaintiff must prove that "the product at issue is sufficiently unsafe so as to render

it defective." *McMahon v. Yamaha Motor Corp., U.S.A.*, 95 So. 3d 769, 772 (Ala.

2012).  "[T]his is done by proving that a safer, practical, alternative design was

available to the manufacturer at the time it manufactured the allegedly defective

product." *Id.* (citation omitted).

Due to the "'complex and technical nature'" of many products, expert

testimony is ordinarily required to prove that a product is defective.  *Verchot*, 812

So. 2d at 303 (quoting *Brooks*, 579 So. 2d at 1332). The product in this case is an electric pallet jack composed of mechanical and electrical components, which are unfamiliar to most lay people. Therefore, a lay juror would need the assistance of expert testimony to determine if the pallet jack is defective, and Harris must rely on such testimony to prove his claim. *See Brooks*, 579 So. 2d at 1333-34 (finding that proving a defect in an automobile brake system requires expert testimony). Raymond maintains that Harris cannot prove his case because his expert's testimony is purportedly inadmissible. Doc. 30 at 14-15. Consequently, Raymond's motion for summary judgment is inextricably intertwined with its motion to exclude the testimony of Dr. Benedict. As a result, the court will begin by addressing the motion to exclude before turning to the summary judgment motion.

## A.      Motion to Exclude Dr. Benedict's Testimony

Raymond challenges Dr. Benedict's testimony under Rule 702 of the Federal Rules of Evidence. Docs. 32; 51. District courts must perform a "gatekeeping" function when determining the admissibility of expert evidence to ensure that speculative, unreliable opinions do not reach the jury. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993); *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237 (11th Cir. 2005); *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). However, "it is not the role of the district

court to make ultimate conclusions as to the persuasiveness of the proffered evidence. . . . Quite the contrary, 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) (quoting *Daubert*, 509 U.S. at 596) (alteration in original omitted). But, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999).

To determine whether expert evidence is admissible under Rule 702, courts in this circuit must conduct a "'rigorous three-part inquiry' assessing whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."

*Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1194 (11th Cir. 2010) (quoting *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004)). The party offering the expert bears the burden of showing by a preponderance of the evidence that the testimony satisfies each prong of the inquiry. *Id.* (citation omitted).

To satisfy prong one, "a party must show that the expert has sufficient 'knowledge, skill, experience, training, or education' to form a reliable opinion about the relevant issue." *Harvey v. Novartis Pharm. Corp.*, 895 F. Supp. 2d 1206, 1209 (N.D. Ala. 2012) (quoting Fed. R. Evid. 702). *See also Frazier*, 387 F.3d at 1261. "Experience in a particular field is not enough to qualify an expert; the expert must have experience with the issue before the court." *Harvey*, 895 F. Supp. 2d at 1209 (citation omitted). But, a witness does not need to be a "leading authority" on the issue. *Hendrix v. Evenflo Co., Inc.*, 255 F.R.D. 568, 578 (N.D. Fla. 2009), *aff'd sub nom Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183 (citations omitted). Rather, "so long as the expert is at least minimally qualified, gaps in his qualifications generally will not preclude admission of his testimony" because such gaps go to the weight of the expert's testimony rather than its admissibility. *Id.* (citation omitted).

To satisfy prong two, a party must show that "'the reasoning or methodology underlying the [expert's] testimony is scientifically valid and [] that [the] reasoning or methodology properly can be applied to the facts in issue.'" *Seamon v. Remington Arms Co., LLC*, 813 F.3d 983, 988 (11th Cir. 2016) (quoting *Daubert*, 509 U.S. at 592-93) (alteration in original omitted). To determine if expert testimony is reliable, a court may consider "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and

publication; (3) the known or potential rate of error of the particular [] technique; and (4) whether the technique is generally accepted in the scientific community." *McCorvey*, 298 F.3d at 1256 (citing *Daubert*, 509 U.S. at 593-94). These *Daubert* factors are not a "definitive checklist or test" for reliability, *Daubert*, 509 U.S. at 593, and the court has "substantial discretion in deciding how to test an expert's reliability . . . ." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005) (quotation omitted). *See also Kuhmo Tire Co.*, 526 U.S. at 152 ("[W]e conclude that the trial judge had considerable leeway in deciding . . . how to go about determining whether particular expert testimony is reliable.").

"The *Daubert*-type analysis should not be used to disfavor expert testimony grounded in experience or engineering practice rather than in pure scientific theory." *Rockhill-Anderson v. Deere & Co.*, 994 F. Supp. 2d 1224, 1230 (M.D. Ala. 2014) (quotation omitted). However, "if the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *Frazier*, 387 F.3d at 1261 (quotation, emphasis, and alteration in original omitted).

Finally, to satisfy prong three, a party must show that the expert's testimony will assist the trier of fact determine a fact in issue. *Hendrix*, 609 F.3d at 1194.

This prong "'goes primarily to relevance.'" *Seamon*, 813 F.3d at 988 (quoting *Daubert*, 509 U.S. at 591). To be considered helpful, the expert's testimony must "concern[] matters that are beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262 (citing *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985)). *See also Evans v. Mathis Funeral Home, Inc.*, 996 F.2d 266, 268 (11th Cir. 1993) (affirming the exclusion of expert testimony that was "within the common knowledge of the jurors").

Raymond challenges Dr. Benedict's testimony on all three prongs, arguing that Dr. Benedict is not qualified, that his methodology is not sufficiently reliable, and that his specific opinions will not assist the jury. *See* doc. 32.

### 1. Whether Dr. Benedict is qualified?

Raymond contends that Dr. Benedict is not qualified to testify as an expert regarding the purported defects in the pallet jack or a safer alternative design because Dr. Benedict has no experience with electric pallet jacks "and little experience with forklifts generally." Doc. 32 at 2, 4, 13-15; 51 at 3. Indeed, Dr. Benedict has never operated, designed, or manufactured an electric pallet jack, and he admits that he is not an expert in the operation of an electric pallet jack. Doc. 38-4 at 5-6. Even so, Raymond's argument is unavailing generally because it improperly frames the issues before the court.

Harris asserts in his complaint that defects exist in the design of the pallet jack and its component parts, including its torsion spring and roll pin. Doc. 1-1 at 9. *See also* doc. 47 at 14. As Harris points out, Dr. Benedict earned a doctorate in mechanical engineering, and he conducted graduate research on "the dynamics and kinematics of linkage and mechanical systems." Docs. 38-5 at 13, 17; 47-14 at 10. Dr. Benedict also has approximately fifty years of engineering experience, and he has designed, developed, and manufactured products that utilize torsion springs and spring pins, which are similar to the torsion spring and pin used in the subject pallet jack. Docs. 38-5 at 17; 38-4 at 7; 47-14 at 10; 47-22 at 7-11. Put simply, Dr. Benedict's education and experience qualify him to testify about the allegedly defective design of the pallet jack, *see Hendrix*, 255 F.R.D. at 578, and his lack of experience with motorized pallet jacks is a matter for cross examination.

   2. <u>Whether Dr. Benedict used sufficiently reliable methodology to reach his opinions?</u>

Next, Raymond attacks Dr. Benedict's methodology as unreliable because Dr. Benedict did not engage in a formal engineering process, perform any testing, or inspect the pallet jack before forming his opinions. Doc. 32 at 5, 18-20. Whether an expert tests his or her theories is just one factor in determining if the expert's methodology is reliable. *See, e.g., Kuhmo Tire Co.*, 526 U.S. at 150. Moreover, an expert may properly rely on testing performed by another individual. *See Rockhill-Anderson*, 994 F. Supp. 2d at 1237 (rejecting a reliability attack based

on an expert's failure to test his opinion because the expert "form[ed] his opinion based on facts and data [] derived from the work of others") (citing *Gen. Motors Corp. v. Jernigan*, 883 So. 2d 646, 663 (Ala. 2003)).

For his part, Harris notes that Dr. Benedict could not inspect or test the handle or throttle assembly of the subject pallet jack because Dollar General did not preserve them, and Harris argues that Dr. Benedict properly relied upon other information available to him. Doc. 48 at 12-15. Indeed, even though Dr. Benedict failed to test his theories or inspect the pallet jack, he reviewed and analyzed the following evidence to develop his opinions for this case: (1) the testimony regarding Harris's accident; (2) Raymond's documents or drawings regarding the roll pin, torsion spring, and redesigned torsion spring; and (3) Musser's post-accident investigation findings, including his finding that the throttle stuck after several trials. *See* docs. 37-1 at 12; 38-4 at 5, 16, 26, 31; 38-5 at 2-9; 47-22 at 13-17. In addition, Dr. Benedict contends that he did not need to perform any of his own testing because "[t]he torsion spring and [roll] pin components are 'simple' components used by engineers in linkage and machine systems," and analysis of those components does not involve "new or evolving scientific principles," but only "application of long-standing and accepted principles of physics, mathematics, engineering, kinematics, and dynamics." Doc. 47-22 at 11-12.

Based on this record, Dr. Benedict reached his opinions regarding the pallet jack's torsion spring and roll pin by applying his education and experience with mechanical systems to the tests performed by Musser, Raymond's design and re-design of the torsion spring, and the circumstances of Harris's accident. In other words, his opinions are not simply an *ipse dixit* assessment. As a result, the court finds that Dr. Benedict's failure to test his opinions or inspect a pallet jack does not render all of his opinions inadmissible. Instead, those failures impact the weight, if any, a jury may assign his opinions.

### 3. Whether Dr. Benedict's specific opinions will assist the jury?

The court turns next to Raymond's challenges to Dr. Benedict's specific opinions, and, in particular, whether these opinions would aid the trier of fact.

#### a. *opinion regarding Harris's operation of the pallet jack*

Raymond challenges Dr. Benedict's opinion that "Harris operated the pallet [jack] in accordance with the operating instructions in the operator and owner's manuals," docs. 38-5 at 9; 38-4 at 21, arguing that Dr. Benedict is not an expert on motorized pallet jack operation and has never seen or operated the product. Doc. 32 at 5. But, one does not need to see or operate a product to opine on whether the operator's testimony is consistent with the instructions in the owner's manual. Still, a lay juror can easily compare the pallet jack's operating instructions with testimony regarding the accident to determine if Harris operated the pallet jack in

accordance with the instructions.  Consequently, Dr. Benedict's opinion on this point will not assist the jury, and it is inadmissible under Rule 702.  *See Frazier*, 387 F.3d at 1262; *City of Tuscaloosa v. Hacros Chem., Inc.*, 158 F.3d 548, 565 (11th Cir. 1998) (finding that the court properly excluded an expert's testimony when "the trier of fact is entirely capable of determining whether or not to draw [the expert's] conclusions without any technical assistance from [the expert]").

b.   *accident reconstruction opinions*

Dr. Benedict opines also that there are two possible ways that the pallet jack could have started moving without Harris's knowledge after Harris brought it to a complete stop.  Docs. 38-4 at 23-24; 47-22 at 17.  The first scenario involves Harris stopping the pallet jack by pushing the handle up or down, and then engaging CoastPRO while the throttle was stuck in a non-neutral position.  Docs. 38-4 at 23, 25-26; 47-22 at 17.  Alternatively, the second scenario involves Harris bringing the pallet jack to stop by plugging it, stepping off the pallet jack, engaging CoastPRO, and then twisting the throttle "a little bit" after engaging CoastPRO. Docs. 38-4 at 23-25, 27; 47-22 at 17.  Raymond argues these opinions are inadmissible because Dr. Benedict did not actually perform any accident reconstruction, that his opinions are inconsistent with Harris's testimony, and that the first proposed scenario could not have occurred because the pallet jack would

have given an error code and shut down if the throttle was stuck in a non-neutral position when Harris engaged CoastPRO mode.  Docs. 32 at 7; 51 at 6, n.1.

Dr. Benedict concedes that he did not test his proposed accident scenarios and does not "have the information to actually confirm that [his first scenario regarding the accident] can really happen."  Doc. 38-4 at 23, 26.  Still, Dr. Benedict asserts that he could reach his opinion based on the witness accounts, the manuals for the pallet jack, and his own "extensive electrical and mechanical engineering experience regarding how the subject pallet jack operated from an electrical engineering, mechanical engineering, and accident reconstruction standpoint . . . ."  Doc. 47-22 at 17.  In addition, contrary to Raymond's contention about the error code and the pallet jack shutting down, Raymond's corporate representative, Robert Kerila, testified that when the throttle is in a non-neutral position, then the pallet jack will give an error code and shut down only if an operator engages CoastPRO mode by hitting one of the jog triggers.  Doc. 38-1 at 12-13.  He did not testify that the pallet jack will shut down if an operator pushes one of the CoastPRO buttons.  *See id.*  In fact, Kerila indicated that an operator could engage CoastPRO mode when the throttle is in a non-neutral position by pushing one of the CoastPRO buttons.  *See id.* at 36.  Thus, the accident could have occurred in accordance with Dr. Benedict's first proposed scenario.

As for the second proposed scenario, although Dr. Benedict acknowledges that it is inconsistent with Harris's sworn testimony that he did not turn the throttle after switching the pallet jack to CoastPRO mode, *see* doc. 38-4 at 25, 27, that discrepancy goes to the weight of Dr. Benedict's opinion rather than its admissibility. *See Daugharty v. F.D.I.C.*, 979 F. Supp. 2d 1353, 1358 (M.D. Ga. 2013) (citation omitted). Accordingly, based on the evidence before the court and Dr. Benedict's explanation of how he formed his opinions, Dr. Benedict's accident reconstruction opinions are admissible under Rule 702, and Raymond's arguments are matters for cross-examination.

c.     *opinions regarding the roll pin design*

Dr. Benedict criticizes the design of the roll pin because it dislodged from its hole in the throttle assembly, which caused it to catch the plastic housing and interfere with the ability of the throttle to return to a neutral position. *See* docs. 38-4 at 11, 13, 30; 38-5 at 9; 47-22 at 15. According to Dr. Benedict, a properly designed roll pin would have prevented this scenario, *see* doc. 38-4 at 30, and, therefore, he opines that this defective design caused Harris's accident, *id.* at 10.

Raymond argues these opinions are inadmissible because Dr. Benedict (1) does not know if the roll pin was in the same condition as when it left Raymond's control, (2) did not test his opinion or his proposed alternative design, and (3) is unfamiliar with the allegedly defectively designed roll pin in the pallet

jack.  Doc. 32 at 8-9.  Many of Raymond's points are well-taken:  Dr. Benedict did not know that the roll pin was "peened," or staked into place, he has not seen a picture of the roll pin used in the 8400 pallet jack,[3] and he could not say if Dollar General maintenance employees had replaced the roll pin,[4] or if those employees properly reattached the pin when they repaired the pallet jack a few months before the accident.  Doc. 38-4 at 11-13.

However, Dr. Benedict has used and designed roll pins for other applications, and he is familiar with how roll pins work based on his understanding of physics and mechanical engineering.  Docs. 38-4 at 11; 47-22 at 5-6, 15.  Dr. Benedict explains that slotted spring pins, such as the roll pin in the pallet jack, are simply pieces of metal "rolled into a tube" with the edges close together so the pin can be compressed to fit tightly into a small hole "such that the compression force between the hole and the spring pin causes the pin to press outward on the hole" to hold the pin in place.  Docs. 47-22 at 6, 15; 38-4 at 30.  Based on his experience, Dr. Benedict opines that a slotted spring pin may weaken over time, which would allow the pin and the parts it holds together to move, as Musser observed in his post-accident testing of the pallet jack.  *Id.* at 15-16.  Therefore, Dr. Benedict states

---

[3] No drawings of the roll pin exist.  Doc. 47-19 at 2.

[4] Raymond's arguments regarding whether the roll pin was substantially altered prior to the accident are addressed in Part III(B)(1), *infra*.

that a slotted spring pin, such as the roll pin at issue, is "not ideally suited for long term use on components subject to torque loads." *See id.* at 15.

Also, Dr. Benedict relied on his understanding of spring pins and Musser's test results to opine that a solid press fit pin secured with Loctite adhesive is a feasible alternative design that would have prevented the roll pin from moving out of position to interfere with the movement of the throttle. Doc. 38-5 at 10. In addition, Dr. Benedict based his proposed alternative design on his experience designing machines or products that utilize similar pins. Doc. 47-22 at 7-10.

Based on this record, Dr. Benedict's opinions about the roll pin's design are sufficiently reliable, and Raymond's criticisms of Dr. Benedict's opinions are matters for cross-examination. *See Daubert*, 509 U.S. at 596 ("[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

d.    *opinions regarding the torsion spring design*

Next, Raymond challenges Dr. Benedict's opinions about the torsion spring design. Doc. 32 at 9-10, 17-20. According to Dr. Benedict, the torsion spring in the pallet jack was defectively designed because it did not maintain the force needed to return the throttle to a neutral position. Doc. 38-5 at 9-10. Dr. Benedict contends that Raymond should have heat-treated the torsion spring so that it would

retain the force required to consistently return the throttle to a neutral position, and he opines that a heat treated spring could have prevented the accident. Docs. 38-4 at 31-33; 38-5 at 10; 37-1 at 12. To formulate his opinion, Dr. Benedict relied in part on documents regarding Raymond's re-design of the torsion spring. Doc. 38-5 at 3, 7-8. Specifically, Raymond redesigned the pallet jack's torsion spring in 2013 based on warranty reports regarding broken springs, or spring failures, and it began heat treating the torsion springs for its pallet jacks. Docs. 38-5 at 8; 47-10 at 2. Dr. Benedict contends that Raymond's documents regarding the redesign show that the original torsion springs were failing, and that he did not need to do any testing to understand that Raymond heat treated the redesigned springs so they would last longer. Doc. 47-22 at 16.

In response to one of Raymond's attacks to his opinion, Dr. Benedict admits that the redesigned torsion spring and the original spring have identical spring constants, or "K values," which, in layman's terms, is a measure of the stiffness or strength of the spring. *See* docs. 38-4 at 32; 47-22 at 13. However, Dr. Benedict testified that a heat treated spring will not weaken over time, which is why "you really need to have [a torsion spring] that's heat treated . . . ." Doc. 38-4 at 31. *See also* doc. 47-22 at 14-15. Dr. Benedict added that based on Musser's post-accident findings that the pallet jack's throttle had an intermittent problem with sticking, he believes that a heat treated torsion spring could have overcome the problem and

returned the throttle to neutral even if the roll pin moved out of place a little. Docs. 38-4 at 32, 34. Therefore, he opines that the throttle would have returned to a neutral position and the accident would not have occurred if Raymond used a heat treated torsion spring in the subject pallet jack. *See* doc. 38-5 at 10.

Although Raymond admits that it redesigned its torsion spring and began heat treating the springs after reports of spring failures, it challenges Dr. Benedict's opinions regarding the torsion spring, arguing that Dr. Benedict does not know if the pallet jack's throttle contained the original or the redesigned spring, citing maintenance records showing that Dollar General replaced a "broken seat spring" in the months before the accident. Doc. 32 at 9, 17-19. This contention is unavailing because, based on the records, the seat spring is a different component than the torsion spring. *See* docs. 47-16 at 2-4; 47-18 at 2-3. Consequently, the maintenance records do not suggest that Dollar General replaced the torsion spring before the accident. In addition, Raymond's expert testified that the torsion spring would probably last longer than the four years the pallet jack had been in operation, which suggests the pallet jack contained the original torsion spring. Doc. 47-15 at 35. In light of this evidence, and based on Dr. Benedict's explanations about how he reached his opinion, the court finds that Dr. Benedict's opinions regarding the torsion spring's design are sufficiently reliable to be admissible under Rule 702.

e.  *opinions regarding Raymond's failure to recall the*
    *torsion spring*

Dr. Benedict opines next that Raymond should have recalled the allegedly defective torsion spring and that such a recall could have prevented Harris's accident and injury.  Doc. 38-5 at 10.  Raymond argues that these opinions are inadmissible because Alabama law does not recognize a duty to recall and Harris does not make "any such allegation or claim in his Complaint."  Doc. 32 at 10-11, 20-21.  The court agrees.  Because there is no duty to recall, *see Lampley v. Bridgestone Firestone, Inc.*, 1992 WL 12666661, at *1 (M.D. Ala. Mar. 31, 1992) (citation omitted), and Harris is not pursuing a failure-to-recall claim, doc. 48 at 25, Dr. Benedict's opinions regarding a recall are irrelevant and will not assist the jury to determine a fact in issue.  As a result, Dr. Benedict's recall opinions are inadmissible under Rule 702, and, in fact, would also be inadmissible under Rule 403 as unduly prejudicial.

f.  *Raymond should have equipped the pallet jack with an*
    *audible alarm*

Finally, Raymond challenges the admissibility of Dr. Benedict's opinion that it should have equipped its pallet jacks with "audible alarms that operated when the motorized pallet [jack] was moving in CoastPRO mode" to warn operators about "unintended movement of the pallet [jack]."  Doc. 32 at 11-12, 16.  *See also* docs. 38-5 at 11; 38-4 at 38.  Dr. Benedict admits that he did no research about the use of audible alarms in a warehouse, and that there are potential downsides to having

audible alarms in a warehouse setting where multiple alarms sounding at once can cause confusion.  Doc. 38-4 at 39.  Moreover, a juror's common sense could tell her that an audible alarm may have alerted Harris that the pallet jack was moving, and "matters of common sense typically do not require or allow for expert testimony."  *Rosenfeld v. Oceania Cruises, Inc.*, 682 F.3d 1320, 1331 (11th Cir. 2012) (Tjoflat, J., dissenting) (citing *Evans v. Mathis Funeral Home, Inc.*, 996 F.2d 266, 268 (11th Cir. 1993)).  As a result, this opinion will not assist the trier of fact and is inadmissible under Rule 702.

### B.     Motion for Summary Judgment

Raymond argues that it is entitled to summary judgment because (1) Harris cannot prove the existence of a defect or that the alleged defect caused his injuries without expert testimony, (2) Harris cannot prove the pallet jack was substantially unaltered, and (3) Harris's own negligence contributed to the accident.  Doc. 30. As discussed above, Harris has introduced admissible expert testimony regarding defects in the pallet jack's roll pin and torsion spring that allegedly caused his accident.  *See* Section III(A)(3)(c)-(d), *supra*.  Consequently, Raymond is not entitled to summary judgment based on an absence of admissible expert testimony. As explained below, Raymond is also not due to prevail on its other two arguments.

1.    <u>Whether the pallet jack was substantially unaltered?</u>

Raymond argues that Harris's claim fails because he cannot prove the pallet jack was "substantially unaltered" between the time it left Raymond's control and the accident.  Docs. 30 at 10-13; 52 at 2-5.  To prevail on his AEMLD claim, Harris bears the burden of proving that the pallet jack "was substantially unaltered when used by him . . . ." *Verchot*, 812 So. 2d at 301 (quoting *Brooks*, 579 So. 2d at 1331-21) (emphasis in original omitted).    "However, the mere fact that a product has been altered or modified does not necessarily relieve the manufacturer [] of liability," *Sears, Roebuck & Co. v. Harri*s, 630 So. 2d 1018, 1027 (Ala. 1993) (citation omitted), and "a manufacturer remains liable if an alteration or change is foreseeable," *Clarke Indus., Inc. v. Home Indemn. Co.*, 591 So. 2d 458, 462 (Ala. 1991) (citing *Beloit Corp. v. Harrell*, 339 So. 2d 992 (Ala. 1976)).

Raymond asserts that Dollar General's maintenance records, which show that the warehouse replaced the handle and a spring for the pallet jack before the accident, prove that the pallet jack was not substantially unaltered.  Doc. 30 at 11-13.   Indeed, as discussed above, maintenance records establish that a Dollar General employee replaced a broken handle and a seat spring on the pallet jack a few months before the accident.  *See* doc. 35 at 1.  However, Musser testified that the broken handle the employee replaced was "[t]he little grab handle" on the outside of the throttle assembly, i.e., a throttle twist grip, and not the entire handle

with the throttle assembly itself. Doc. 38-6 at 17. Musser's testimony is supported by the work order related to the repair. *See* doc. 47-20 at 2. Similarly, the records reveal that an employee replaced a "seat spring" in the pallet jack—not the torsion spring at issue. *See* docs. 47-16 at 3-4; 47-18 at 2-3. Thus, the repair records belie Raymond's contention that the pallet jack was substantially altered.

Next, Raymond points to evidence of Dollar General's quarterly preventative maintenance to argue that Harris cannot prove the pallet jack was substantially unaltered. Doc. 30 at 11. The quarterly maintenance includes taking the pallet jack's handle apart to inspect its components. Doc. 38-6 at 58. Dollar General's maintenance records, however, do not reflect that either the pallet jack's throttle assembly or any of its component parts were replaced prior to the accident. *See* doc. 35 at 1. In addition, Raymond's expert testified that the "torsion spring would probably [last] longer than the time the [pallet jack] had been in operation." Doc. 47-15 at 35. This evidence belies Raymond's assertion that Harris cannot show that the pallet jack was substantially unaltered.

Moreover, the record shows that Dollar General's mechanics utilize maintenance repair manuals provided by Raymond. *See* docs. 47-12 at 25-26; doc. 38-1 at 32. Providing those manuals to owners of its pallet jacks indicates that Raymond expects and could reasonably foresee that they would perform repairs on the pallet jacks. Accordingly, evidence that a Dollar General mechanic reattached

the throttle assembly's roll pin, *see* doc. 35 at 1, does not prove that the pallet jack was substantially altered at the time of the accident. *See Clarke Indus., Inc. v. Home Indemn. Co.*, 591 So. 2d at 462.

Based on this record, Raymond has not established that Harris cannot prove that the pallet jack was substantially unaltered at the time of the accident. Rather, viewing the evidence in the light most favorable to Harris, a genuine issue of material fact exists on this issue.

2. <u>Whether Harris was contributorily negligent as a matter of law?</u>

Raymond argues also that Harris's own negligence contributed to the accident. Docs. 30 at 16-18; 52 at 6-10. Under Alabama law, a plaintiff's contributory negligence precludes recovery for an AEMLD claim. *McMahon*, 95 So. 3d at 773 (citing *Hannah v. Gregg, Bland & Berry, Inc.*, 840 So. 2d 839, 860 (Ala. 2002)). "A plaintiff is contributorily negligent in handling a defective product when he or she fails to use reasonable care with regard to that product." *Haisten v. Kubota Corp.*, 648 So. 2d 561, 565 (Ala. 1994). "The question of contributory negligence is normally one for the jury. However, where the facts are such that all reasonable persons must reach the same conclusion, contributory negligence may be found as a matter of law." *Hannah*, 840 So. 2d at 860 (citation omitted). "To establish contributory negligence as a matter of law, a defendant seeking summary judgment must show that the plaintiff put himself in danger's

way and that the plaintiff had a conscious appreciation of the danger at the moment the incident occurred." *Id.* (citation omitted). The defendant must do more than establish that "the plaintiff failed to exercise reasonable care;" the defendant must also "establish by undisputed evidence a plaintiff's conscious appreciation of danger." *Hannah*, 840 So. 2d at 861 (citing *H.R.H. Metals, Inc. v. Miller*, 833 So. 2d 18 (Ala. 2002) (distinguishing the proof required to establish contributory negligence as a matter of law from the jury's consideration of contributory negligence). *See also Tell v. Terex Corp.*, 962 So. 2d 174, 180 (Ala. 2007) ("The evidentiary showing required to obtain a summary judgment on the basis of [] contributory negligence is very demanding.").

Raymond argues that Harris was negligent because he violated safety rules by (1) walking in front on the pallet jack, rather than beside it, with CoastPRO engaged; (2) not paying careful attention to the pallet jack when he was picking his order immediately before the accident; and (3) not leaving enough space to prevent him from being trapped by the pallet jack and nearby objects. Doc. 30 at 17-18. *See also* doc. 38-4 at 23.[5] But, even if Harris violated safety rules, that is not sufficient to establish that he had a conscious appreciation of danger. Harris testified that he brought the pallet jack to a complete stop before he placed it in

---

[5] Harris's contention that the contributory negligence issue is "limited to evidence of whether [Harris] misused the throttle handle to contribute to its sticking," doc. 47 at 32 (emphasis in original omitted), misses the mark. The product at issue is the pallet jack as a whole, and evidence regarding Harris's operation of the pallet jack is relevant.

CoastPRO mode and walked to the front of it to pick up merchandise, and a co-worker confirmed that Harris stopped the pallet jack before the accident. Docs. 38-2 at 14; 38-3 at 27. In addition, Raymond's own expert admitted that a pallet jack operator would not expect a pallet jack in CoastPRO mode to move forward on its own and that an operator could walk in front of a pallet jack if the unit was completely stopped. Doc. 47-15 at 16, 40. Based on this record, Raymond has not established that Harris consciously appreciated the danger he faced at the moment of the accident. As a result, the issue of contributory negligence is for a jury.

## IV. CONCLUSION

For the reasons explained above, Raymond's motion to exclude the expert testimony of Charles E. Benedict, Ph.D., doc. 32, is due to be granted in part. Because questions of material fact exist regarding Harris's AEMLD claim, Raymond's motion for summary judgment, doc. 30, is due to be denied. A separate order will be entered.

**DONE** the 21st day of December, 2018.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE